## THE F. W. VOSBURGH.

### THE J. T. WHITBECK.

#### VASSAR v. THE F. W. VOSBURGH et al.

(District Court, E. D. New York. April 20, 1898.)

COLLISION—UNLAWFUL NAVIGATION.

The tug V., with a dumper on each side, in proceeding down the East river kept about 200 feet from the Brooklyn shore, in order to escape the flood tide,—a usual custom. The W., a tug with a barge on a hawser, was going up the river, about 450 feet from the Brooklyn shore. In rounding the bend at Fulton Ferry, neither gave a signal; and the V. headed well into the stream, and collided with the barge, the W. making no effort to avoid her. *Held*, that the V. was at fault, in navigating too near the shore, and the W. in not attempting to go to port, so as to avoid her.

This was a libel in rem by Robert G. Vassar against the tugs F. W. Vosburgh and J. T. Whitbeck to recover damages resulting from a collision between libelant's barge, while in tow of the Whitbeck, and, a dumper towed by the Vosburgh.

Macklin, Cushman & Adams, for libelant.

Carpenter & Park, for the Vosburgh.

Henry W. Goodrich, for the J. T. Whitbeck.

THOMAS, District Judge. The brief on behalf of the Vosburgh gathers and seasonably presents some judicial comments upon the uncertainties and mendacities that attend cases of this nature. The true issue is whether the tugs, Whitbeck and Vosburgh, were severally navigating in that part of the East river where the law required them to be, and whether they met the demands of good navigation. To aid the solution of the material issues, not a single witness is produced from either tug or its tow whose truthfulness or accuracy of observation is beyond very grave suspicion. It results that any judicial view of the causes of the accident, and of the culpability of the parties therefor, must itself be imperfect. On the 19th day of December, 1892, the Whitbeck, a tug 55 feet in length, towing the Volunteer, a squareboxed, rudderless scow (dimensions 80 feet in length by 25 feet in width), loaded with stone, came from Buttermilk channel, keeping

nearer to the Brooklyn shore. She was carrying the requisite lights, although it was not sufficiently dark to require them to apprise other vessels of her locality. The Whitbeck was bound for the foot of Division avenue, Williamsburg. The captain of the Whitbeck testified that when just south of the Brooklyn Bridge, or opposite Fulton Ferry, on the Brooklyn side, he saw the tug Vosburgh, carrying proper lights, with a dumper on each side, swing away from the dock at Rutgers street, New York; that the Vosburgh crossed the river some 1,500 or 2,000 feet above him, and came directly and close to the Brooklyn shore; that the Vosburgh, when about 100 feet from the Brooklyn shore, and about 500 feet north of the Whitbeck, and with about 1,000 feet between their courses, straightened upon a down course; that the Whitbeck was headed up the river; that then the Vosburgh "went straightened down the river, and she took a cant off too far, and sheered over towards me again," changing her course two points, with the result that the starboard dumper struck the starboard side of the scow, doing injury; that the Whitbeck was going about 5 or 6, and the Vosburgh about 3, miles an hour; that he gave the Vosburgh two whistles at the time when the latter swung towards him (that is, when the latter was about 500 feet away); that the Vosburgh did not respond until the Whitbeck had repeated the signals, when the Vosburgh was about abreast of her, shaping her course directly for the Volunteer, which was following directly in the course of the Whitbeck; and that when the Vosburgh was between the Whitbeck and the Volunteer the Whitbeck blew an alarm whistle, whereupon it appears that both tugs stopped, and the Vosburgh claims to have reversed, although the captain of the Whitbeck says that the Vosburgh did not reduce her speed. The collision happened right off Empire Stores, Brooklyn. The captain of the Whitbeck claims that he was during these events about one-third of the way across, and heading up, the river. Every witness connected with the Whitbeck or her tow states that the hawser running to the barge was about 20 or 25 fathoms long, connected to the barge with a bridle. This seems to be the probability, although the witnesses for the Vosburgh make the hawser 45 to 50 fathoms, and without a bridle, or at least with a single fastening to the bitt of the Volunteer. The statement of the captain of the Whitbeck is palpably untrue in a certain particular. His circumstantial description of seeing the Vosburgh swing off from Rutgers street, New York, and go straight across the river from that point, is so at variance with other testimony as to make the court quite conservative in accepting the observation of this witness in any particular. The Vosburgh took on her second dumper at Thirty-Eighth street, and claims to have crossed the river at Jackson street, and thence to have come down close to the Brooklyn shore. Her captain states that he did this to get the slack water, and escape the flood tide at that time prevailing. This appears to be in accordance with the usual custom of navigation, although absolutely contrary to law. The Vosburgh's captain also states that when he first saw the Whitbeck the Vosburgh was about 200 feet from the Brooklyn shore, heading directly down stream; that the Whitbeck was about 800 feet distant, and 200 feet from the Brooklyn shore, pointed towards Rutgers street; that he saw both the port and starboard

lights of the Whitbeck; that, upon receiving the Whitbeck's signal, the Vosburgh starboarded; that the Whitbeck did not starboard. He says, however, that, after the signals were given, the Whitbeck's port lights were shut out. · The confusion of the witness as to whether it was the green or red light that was shut out raises a doubt as to the value of his observation. He states that he was heading straight with the docks at the time of the collision, or a little in, and had his helm hard a-starboard. This witness accounts for the accident upon the theory that the Volunteer headed off on her starboard quarter, so that she was parallel with the Brooklyn shore. His diagram, however, shows that the Volunteer was headed for the New York shore. The evidence of those on the dumpers of the Vosburgh is that the Vosburgh was about 200 or 250 feet off the Brooklyn shore. The engineer of the Whitbeck states that the Whitbeck was one-third over from the Brooklyn shore, with 150 yards between her course and that of the Vosburgh, which should have caused them to pass at an interval of 100 yards, and that the Vosburgh was 300 or 400 yards from the Brooklyn piers. The river is about 1,400 feet wide at the point of the collision. The value of this evidence will be illustrated later. However perplexing this evidence, there is one sure starting point, viz. the unlawful navigation of the river by the Vosburgh. It may be that some fault of the Whitbeck was a contributing cause of the injury. That will be considered. But, as to the Volunteer, the fault of the Vosburgh is not excused; and the latter, at least, is liable for the libelant's injury. Is the Whitbeck also liable? The probabilities are, as between the conflicting statements of those on the Whitbeck and those upon the Vosburgh, that the former are correct as to the fastening of the hawser, and, on the whole, culpable fault in this regard against the Whitbeck may not be concluded.

The next question is, was the Whitbeck herself unlawfully near the Brooklyn shore? The captain of the Whitbeck, whose observation should be accepted sparingly, states that when the Vosburgh was straightened down the river she was 500 feet up the river from the Whitbeck, with 1,000 feet between their courses, and that the Vosburgh came over towards him, and hit his tow. The distance across the river was about 1,400 feet. This would have put five-sevenths of the river between the two boats, and, indeed, the Whitbeck very near to the New York shore. The engineer's exaggeration in the same regard has been pointed out. The following would be a diagram of the location of the boats:

The captain of the Whitbeck states that his tug was pointing up the river, and that he was going 5 or 6 miles per hour, while the Vosburgh was going 3 or 3½ knots per hour.    Then the Whitbeck was going nearly twice the rate of the Vosburgh.    Now, the Whitbeck's captain claims that from the Empire Stores, B, the Vosburgh canted off, and got so far upon his course as to hit his barge on her bow, which, as he claims, was following straight behind him.    Therefore the Vosburgh must have gone over much more than 1,000 feet while the Whitbeck was traveling, at 5 or 6 miles per hour, 500 feet, plus about 150 feet, the length of the hawser line, plus some portion of the length of the scow.    This could not be true.    But, again, in a more indefinite way, the captain and engineer of the Whitbeck say that the Whitbeck was one-third over from the Brooklyn shore (that is, about 450 feet), and the Vosburgh was about 100 feet from the shore.    The following would be the position of the boats:

It is evident that if the Vosburgh had turned at right angles, and sailed for the point D, she would have made the shortest distance between her and the course of the Whitbeck, and it was possible thus to hit the Volunteer.    But this is on the theory that the Vosburgh changed her course directly towards the Whitbeck's course.    The evidence of the captain of the Whitbeck is that the Vosburgh changed her course, when she canted, about two points, and he illustrates his recollection of her course by the map following page 25 of the evidence.    It is perfectly evident that on such a course, and with such distance and relative speed, the Vosburgh would not have collided with the scow.    This leads to the conclusion that the captain of the Whitbeck was mistaken in his distances, and he was much nearer the Brooklyn shore than he stated. It seems to be the idea of those connected with the Vosburgh that she was 200 feet off shore.    This would put 250 feet between the courses of the Whitbeck and the Vosburgh; assuming that the Whitbeck was 450 feet off, or one-third of the way over.    With such distances, the Vosburgh might have taken a course that would bring her in collision with the Volunteer.    In the uncertainty of the matter, it is preferable to hold that, while the Whitbeck was probably within the alleged distance of one-third out, yet she was not so far in as to make her negligent from that fact alone.    Although the Whitbeck may not be found culpably negligent on account of her position in the river, yet she was so far towards the

Brooklyn shore that it becomes important to consider whether she did all that good navigation required to avoid the accident. Should she have attempted to go further to port? The Whitbeck's captain states that he was headed up the river, and did not change his wheel when he saw the Vosburgh coming towards him. His alleged reason for not doing so is that he did not have time to get off. During the same time the Vosburgh, as he claims, made the distance towards the Whitbeck's course, so as to hit her tow. It is true that the Vosburgh's captain states that the Whitbeck was heading about for Rutgers street, but that he saw the Whitbeck's green and port light when the Vosburgh was headed down the river. In such relative positions, the Vosburgh's captain could not have seen the Whitbeck's port light. Moreover, the Vosburgh's captain says that the boats were about head on; and then, in contradiction, he states that, after seeing both of the Whitbeck's side lights, the port light shut in. This seemingly indicates a movement of the Whitbeck to port, which is strengthened by the further statement of the Vosburgh's captain that the Whitbeck hauled off. All this would lead to the conclusion that the Whitbeck starboarded, but it is opposed by the positive evidence of the Whitbeck's captain that he was headed up the river, several times repeated, and did not change his wheel. Upon the argument, counsel for both parties, in reply to an inquiry of the court, stated that there was no evidence that the Whitbeck starboarded. In the position in the river necessarily occupied by the Whitbeck, as heretofore discussed, and in view of the fact that her captain saw the Vosburgh directing her course for the Volunteer, it was a duty that the Whitbeck owed the Volunteer, if not the Vosburgh, to use some effort to get out of the Vosburgh's way. But the Whitbeck kept on her way. This, as to the Volunteer, was negligent. The probable fact is that the Vosburgh was some 200 feet out from the shore, that the Whitbeck was nearer to the Brooklyn shore than her captain has testified, and that in rounding the bend in the river, extending from Fulton Ferry to the Empire Stores, neither boat gave a signal; that the Vosburgh, intending to go around this bend, was heading well into the stream, and, maybe, was caught and carried out by the tide; and that the Whitbeck, headed up the river, did not attempt to go to port. The specific fault of each vessel has been pointed out. It is impossible to measure the relative culpability of these boats, or the degree to which each contributed to the injury. They should, as between themselves, bear the damages equally; but, as to the libelant, each should be liable for the whole. It results from the above that a decree must be entered for the libelant, for such damages suffered by the Volunteer as may be found, against both the Whitbeck and the Vosburgh; the damages to be paid equally by said respondents, with the right of the libelant, in case of inability to collect a moiety or any part thereof from one respondent, to resort to the other respondent for the same.